**J.P. ROULY, Plaintiff-Appellant,**

v.

**ENSERCH CORPORATION, et al.,
Defendants-Appellees.**

No. 87–3241.

United States Court of Appeals,
Fifth Circuit.

Jan. 20, 1988.

---

Michael H. Piper, III, Metairie, La., for plaintiff-appellant.

David L. McComb, Julie D. Livaudais, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, La., for defendants-appellees.

Before SNEED,[*] REAVLEY, and JOHNSON, Circuit Judges.

JOHNSON, Circuit Judge:

A discharged employee sued his former employer for defamation and invasion of privacy. The district court granted summary judgment for the employer. For the reasons outlined below, we affirm.

## I. BACKGROUND

Pool Offshore Company is a division of Pool Company, which in turn is a subsidiary of Enserch Corporation. In September 1983, Pool Offshore Company (hereafter "Pool") hired plaintiff J.P. Rouly as a turnkey operator and drilling superintendent. In October 1983, Enserch began an investigation into conflicts of interest and kickback schemes at Pool. As a result of this investigation, several Pool employees were later indicted.

In March or April 1984, three blowout preventers were returned to Pool from the Seabreeze Stabilizer Corporation, along with an invoice from Julie Ann Corporation for eight months' storage. Since Pool had no record of the equipment's having been rented to either corporation, Wilson Pratt, the Enserch employee in charge of the kickback investigation, looked into the matter. Pratt noted that Rouly had been president of Seabreeze before joining Pool; that Rouly had purchased a car from Julie Ann Corporation; and that Rouly had requested reimbursement for business lunches with Seabreeze employees. Pratt suspected that Seabreeze and Julie Ann were related corporations, as they shared the same business compound and related dealings. Jerry Shanklin, then president of Pool, inspected the returned blowout preventers and observed that they were slightly rusted and appeared not to have been rented out.

* Circuit Judge of the Ninth Circuit, sitting by designation.

Apparently armed only with this information, Pool decided to suspend Rouly. On January 8, 1985, William Glass, a Pool vice president, called Rouly into his office and announced the suspension. Jim Cole, the Pool personnel manager, was also present. Rouly was told that he was being suspended for possible violations of Pool conflict of interest policies. Eight other employees, some later indicted, were suspended the same day in the same manner. Two sheriff's deputies stood in the hallway outside to prevent possible violence by those discharged. On February 5, 1985, Pool sent Rouly a letter converting his suspension into a termination.

Apparently within minutes of the suspensions, news began to spread through the rumor-prone oil industry of Harvey, Louisiana. Rouly later (after suit was filed) submitted numerous depositions and affidavits from oilfield employees and executives stating that they heard rumors that J.P. Rouly had been accused of criminal activity. Richard Abadie, a Pool sales manager, heard the rumors and went to personnel manager Cole to protest that Rouly could not have been involved. Cole allegedly responded that Rouly " 'was suspended right along with the rest of them.' " Record Vol. 2 at 395. Abadie also reported that Cole said, " 'Don't worry about J.P. Rouly, we've got J.P. Rouly.' " In the days that followed, Abadie made his sales rounds and met other oil industry contacts at their businesses and at restaurants that were oilfield hangouts. Abadie allegedly told Kenneth Dalrymple of the Shell Oil Company that Rouly was "[s]uspended pending the results of an investigation." Record Vol. 2 at 432. Dalrymple had the impression that Rouly was suspended for taking kickbacks. Abadie spoke to Leo Biggers, partner in an oil tool rental company, at a restaurant. Abadie allegedly told Biggers that Glass said of Rouly, " 'There's no way he's not guilty, now we have that S.O.B.' " Record Vol. 2 at 369. Other oilfield executives heard rumors from unspecified sources that Rouly had been involved in improprieties.

Rouly filed suit in Louisiana state court for defamation and invasion of privacy against Enserch, Pool, Glass, and Pratt. The defendants, citing diversity jurisdiction, removed the case to federal court. In March 1986, the district court granted summary judgment for Enserch and Pratt but denied the motion of Pool and Glass. Discovery was completed. In March 1987, just before trial, the district court granted Pool and Glass' renewed motion for summary judgment. This appeal followed.

## II. DISCUSSION

Because the district court granted summary judgment, we view the evidence in the light most favorable to Rouly and we will reverse if Rouly can demonstrate the existence of a genuine issue of material fact. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). However, summary judgment is proper if the nonmoving party fails to present enough evidence on an essential element of his case to justify a jury in finding for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194–95 (5th Cir.1986).

To win a suit for defamation, a Louisiana plaintiff must prove that the defendant (1) maliciously (2) published (3) a defamatory message that (4) was false and (5) caused injury. *Makofsky v. Cunningham*, 576 F.2d 1223, 1235 (5th Cir.1978); *Cangelosi v. Schwegmann Bros. Giant Supermarkets*, 390 So.2d 196, 198 (La.1980); *Drury v. Feeney*, 505 So.2d 111, 113 (La.App.1987, writ denied, 506 So.2d 1225 (La.1987)). If the message sued for is defamatory per se—that is, if the words, without reference to their context, amount to accusation of a crime or similar conduct—then malice and injury are presumed. *Makofsky*, 576 F.2d at 1235; *Manale v. City of New Orleans*, 673 F.2d 122, 125 (5th Cir.1982); *Crump v. Crump*, 393 So.2d 337, 339 (La.App.1980).

None of the statements allegedly made by Pool and its employees explicitly accuse Rouly of criminal activity. The closest statement in the record is Glass' remark, relayed to Biggers via Abadie: " 'There's no way he's not guilty, now we have that

S.O.B.'" Record Vol. 2 at 369. The word "guilty" in this context can just as easily refer to a violation of company conflict of interest policy as to violation of the criminal law. Because the remarks do not amount to defamation per se, Rouly must prove all the elements of defamation.

The district court held that Enserch and Pool were protected by a qualified privilege for statements made by one company employee to others. Qualified privilege is an affirmative defense to defamation provided by Louisiana law for one who can prove that he made a statement (1) in good faith (2) on a matter in which he had an interest or a duty (3) to another person with a "corresponding interest or duty." *Jones v. Wesley,* 424 So.2d 1109, 1111 (La.App.1982); *see also Cashio v. Holt,* 425 So.2d 820, 822 (La.App.1982, writ denied, 430 So.2d 94 (La.1983)); *Clements v. Ryan,* 382 So.2d 279, 282 (La.App.1980). Good faith or lack of malice does not mean lack of hostility or ill feeling; it means that " '[T]he person making the statement must have reasonable grounds for believing that it is true and he must honestly believe that it is a correct statement.'" *Wesley,* 424 So.2d at 1111 (quoting *Cormier v. Blake,* 198 So.2d 139, 144 (La.App.1967)). The burden of proving malice or lack of good faith rests on the plaintiff. *Clements,* 382 So.2d at 282; *see generally* W. Keeton, D. Dobbs, R. Keeton, D. Owen, *The Law of Torts* § 115 at 835–36 (5th ed. 1984).

All of the statements allegedly made within the walls of Pool and Enserch concerned the termination of Rouly and the reasons for his termination. Pratt, Glass, and Cole, who were actively involved in investigating the terminated employees, obviously had to communicate with each other in order to carry out the investigation. Abadie involved himself in the investigation of Rouly by stepping forward to give information and opinions to Glass concerning Rouly. Moreover, this Court has recently held, in a case concerning the similar Mississippi qualified privilege, that all employees have an interest in their employer's termination policies and grounds for termination. *Garziano v. E.I. Du Pont De Nemours & Co.,* 818 F.2d 380, 385–88 (5th Cir.1987).

Further, Rouly has presented no evidence that malice or lack of good faith motivated the statements made within company walls. Glass' reported reference to Rouly as an "S.O.B." does not show malice. *Ferlito v. Cecola,* 419 So.2d 102, 105 (La. App.1982, writ denied, 422 So.2d 157 (La. 1982)) ("profane language" does not constitute defamation per se or proof of malice). The record shows that Enserch and Pool had reason to suspect widespread improprieties among employees. The investigation revealed irregular dealings between Pool and companies with which Rouly had been affiliated. This evidence of impropriety may have been thin, but it existed, and its significance no doubt appeared magnified in light of the more serious wrongdoing of other employees. Rouly points to a statement by Pool's former president, Shanklin, that the blowout preventers were rusting and did not seem to have been rented or used. Rouly contends that Shanklin's report showed the Enserch and Pool investigators that Rouly could not have been renting Pool equipment to Seabreeze and pocketing the money. However, Shanklin's report would not necessarily eliminate all of the investigators' suspicions: they might believe that Rouly was unduly careless in keeping track of company property or in following procedures designed to keep other employees from defrauding the company. In short, Rouly did not present enough evidence to negate Pool's good faith and create a genuine issue as to the statements made within Enserch-Pool walls.

Rouly also appeals the district court's dismissal of his claims for remarks allegedly made by Pool employees to outsiders. In particular, Rouly contends that Pool and Enserch are liable for Richard Abadie's telling several of his contacts in the industry that Rouly had been terminated for involvement in the theft-kickback scheme. Under Louisiana law, an employer can be held liable for an employee's defamatory words if the employee uttered those words "within the course and scope

of his employment." *Manale*, 673 F.2d at 126; *Ardoyno v. Ungar*, 352 So.2d 320, 321 (La.App.1977, writ denied, 354 So.2d 210 (La.1978)). The test of when an employee acts within the scope of his employment depends on the facts of each case, but Louisiana courts look at whether the employee's conduct

> (1) was "primarily employment rooted"; (2) was reasonably incidental to the performance of employment duties; (3) occurred on the employment premises; and (4) occurred during working hours.

*Manale*, 673 F.2d at 126 (quoting *Lebrane v. Lewis*, 292 So.2d 216, 218 (La.1974)); *see also Weysham v. NOPSI*, 385 So.2d 19, 22 (La.App., writ ref'd, 392 So.2d 690 (La. 1980)). Another way to phrase the inquiry is " 'whether the employee is performing some function for his employer and for which he was employed.' " *Orgeron v. Sweatman*, 367 So.2d 1199, 1200 (La.App. 1978, writ denied, 371 So.2d 615 (La.1979)). Thus, in *Orgeron*, an employer was held liable when a truck driven by an employee struck the plaintiff's car. The accident occurred as the employee was driving the truck home after working hours, but the company had asked employees to drive their trucks home in order to stop a rash of thefts from the company lot. *Orgeron*, 367 So.2d at 1200. In *Manale*, a police supervisor called an officer a "fruit" repeatedly in the police station while both were on duty. The department was held liable, especially since it showed awareness of the supervisor's actions by reprimanding him. *Manale*, 673 F.2d at 126. In *LeBrane* and *Weysham*, the employee initiated a fight while protecting the employer's property. *LeBrane*, 292 So.2d at 218; *Weysham*, 385 So.2d at 23.

Abadie made his alleged remarks to friends and business contacts over the telephone and at restaurants. The "premises" and "business hours" tests are of little help in weighing the actions of a salesman who, as Rouly points out, must keep up contacts with customers and frequently meets customers away from the office in semi-social surroundings. We are left with the "employment duties" test. J.B.N. Morris, an oilfield executive, testified that, when he spoke to Abadie about Rouly, they were making "cheap conversation," not transacting business. Record Vol. 2 at 377. Biggers testified that, when he talked to Abadie at the Cypress Restaurant and Lounge, they "weren't doing business." Record Vol. 2 at 370. Willis Cunningham, a former Pool salesman, stated that he initiated a telephone call to Abadie about several drilling rigs:

> ... And during the conversation I asked him how everything was going over there because even though I left Pool I liked all the people over there. Everybody. And he told me that J.P. was no longer over there. ... Well, all Dickie [Abadie] told me was that they let him [Rouly] go. ... He said just told me there was some sort of improprieties, that Pool felt there was some sort of improprieties and they let him go.
>
> Q: Were those the words that he used?
> A: Right.
> . . . .
> Q: Did he say what kind of improprieties?
> A: No.
> Q: Did you ask?
> A: No.

Record Vol. 2 at 382–83.

Pool employed Abadie as a salesman, not as a personnel or public relations officer. Rouly worked in operations, a completely different department from Abadie's. Rouly's troubles had no bearing on the products and services Abadie sought to sell to Pool's customers. Nor was the picture of disarray in Pool's other departments one that Abadie would see as a useful sales tool. If anything, the picture would make Abadie's contacts less likely to wish to deal with Pool. What emerges from the testimony is a portrait of a garrulous and indiscreet salesman in a gossip-prone business, who meets others from the same business and joins in gossip about an event in another division of his company. Of the three specific conversations that Rouly cites, two were not business conversations at all; in the third, Rouly's name came up as Abadie and the caller made conversation after com-

pleting their business. One can imagine a closer case: for example, one in which a salesman purveys gossip relating to the product he is selling. This is not that case. Abadie's gossip was the verbal equivalent of a "frolic and detour" taken in a company car. Keeton, *The Law of Torts* at 503.

In *Garziano*, the Mississippi libel case, this Court discussed whether the employer would be liable because employees not involved in the plaintiff's termination discussed that termination outside the company. We concluded:

> It is not enough for Garziano to prove that Du Pont employees discussed the contents of the bulletin (as relayed to them) with third parties. It is *the supervisors, not the employees, who are the agents of Du Pont's management.* The question of abuse by excessive publication must focus on the *actions taken by Du Pont supervisors in disseminating* the bulletin and whether such actions were within the authority delegated by Du Pont.

*Garziano*, 818 F.2d at 395 (emphasis added). A similar analysis obtains under Louisiana law. Abadie, a salesman, was not Pool's "agent" for conveying Pool's personnel decisions to outsiders. Abadie's remarks did not bear a sufficiently close relation to the duties for which Pool hired Abadie. Since the underlying facts are not in dispute, the district court did not err in granting summary judgment on the remarks made to outsiders.

Rouly also argues that the district court erred in rejecting his suit for invasion of privacy. Rouly contends that Pool placed him in a false light before the public by suspending him on the same day and under the same circumstances as the employees later indicted. The manner of his firing, Rouly insists, caused the public to falsely conclude that Rouly, too, had committed crimes.

Louisiana does recognize a cause of action for "publicity which unreasonably places the plaintiff in a false light before the public." *Jaubert v. Crowley Post-Signal, Inc.*, 375 So.2d 1386, 1388 (La.1979). In the instant case, there is little doubt that rumors linking Rouly to criminal activity did reach the public and that those rumors were false. However, to be actionable, a defendant's actions in a false-light privacy suit must be unreasonable. The Louisiana courts have declared, "The reasonableness of a defendant's conduct is assessed by balancing his interest in pursuing his course of conduct against the plaintiff's interest in protecting his privacy." *Parish National Bank v. Lane*, 397 So.2d 1282, 1286 (La.1981). In *Klump v. Schwegmann Bros. Giant Supermarkets*, a supermarket informed a bakery operating within the supermarket that a bakery employee was suspected of altering price slips. 376 So.2d 514, 515 (La.App.1979, writ denied, 378 So. 2d 1391 (La.1980)). The bakery fired its employee, even though there was evidence against criminal liability. *Klump*, 376 So. 2d at 515. The Louisiana court held that the supermarket acted reasonably in reporting to the employer, because the supermarket's interest in protecting itself outweighed the interest of the employee, who was subject to employment at will in any case. *Id.* The *Klump* court specifically rejected the argument that the supermarket could have accomplished the same purpose "more diplomatically" by allowing the employee herself to give the news to her employer. *Id.*

In the instant case, Pool was protecting important interests by terminating not only employees who had engaged in criminal activity, but also employees who had apparently violated noncriminal company policies. There was some utility for the company in carrying out all the firings on the same day, so as to present a strong picture to remaining employees and so as to use the deputy sheriffs to protect against outbursts. In view of the extensive evidence concerning the fertility of the oil patch for rumors, Rouly's argument that a one day delay would have spared him is unconvincing. In any event, Pool's need to quickly clean house outweighs the purely speculative benefit to Rouly of a few days' delay. Because Pool's conduct was not unreasonable, the district court did not err in rejecting the invasion of privacy claim.

Finally, Rouly argues that the district court could not grant summary judgment in favor of Pool and Glass, having denied summary judgment against those defendants a year before. Rouly admits in his brief that the parties submitted additional affidavits and depositions after the first motion. Rouly cites no authority for the proposition that a district court confronted with new evidence may not reconsider a summary judgment motion. The argument is without merit.

## III. CONCLUSION

The statements made within the walls of Enserch and Pool concerning Rouly's termination are protected by qualified immunity. The statements made by Pool's salesman, Abadie, to outsiders, fell outside the scope of Abadie's employment. Pool did not discharge Rouly in a manner so unreasonable as to give rise to an action for invasion of privacy. Therefore, the judgment of the district court is

AFFIRMED.