Nicolas ESTIVERNE,
Plaintiff–Appellant,

v.

LOUISIANA STATE BAR ASSOCIA-
TION, Defendant–Appellee.

No. 88–3012
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Jan. 4, 1989.

Nicholas Estiverne, New Orleans, La., pro se.

Carl J. Barbier, New Orleans, La., for defendant-appellee.

Before POLITZ, KING and SMITH, Circuit Judges.

KING, Circuit Judge:

Plaintiff-appellant Nicolas Estiverne ("Estiverne") brought this suit against the Louisiana Bar Association ("Bar Association") after the Committee on Professional Responsibility published in the *Louisiana Bar Journal ("Bar Journal")* a report on disciplinary proceedings against Estiverne. Estiverne sued the Bar Association claiming first that the report was defamatory, and second, that his first amendment, equal protection, and due process rights were violated by the *Bar Journal*'s refusal to allow him to purchase space in which to "give his side of the story."

Defendant-appellee, the Louisiana Bar Association, filed a motion to dismiss for failure to state a claim and, in the alternative, a motion for summary judgment. The District Court for the Eastern District of Louisiana granted defendant's motion for summary judgment. The district court held that as a matter of law the report was not defamatory because the information contained in the report was not false. Second, the district court held that the *Louisiana Bar Journal* was not a public forum and that plaintiff therefore had no right of access to the *Bar Journal*. Estiverne's first amendment rights were therefore not infringed by the *Bar Journal*'s refusal to allow him to respond to the report. The district court found that Estiverne's due process and equal protection claims were equally without merit. Estiverne filed a timely notice of appeal.

For the reasons set forth below, we affirm the judgment of the district court.

## I.

The underlying facts are essentially undisputed. On June 19, 1986, the Committee on Professional Responsibility of the Louisiana State Bar Association filed a petition for disciplinary action against Mr. Estiverne in the Louisiana Supreme Court. The Committee on Professional Responsibility, in accordance with its usual policy, published a report in the August 1986 issue of the *Bar Journal* which listed the petitions filed in the supreme court, including that which had been filed against Mr. Estiverne. Further developments in the case were noted in subsequent issues of the *Bar Journal*. These reports contained the following information on Estiverne's case: "Commissioner appointed 10/16/86," "Commissioner's hearing held 12/8/86," case "set for argument before Supreme Court 6/22/87," and case "argued and submitted to the Supreme Court 6/22/87."

The supreme court concluded in September of 1987 that Mr. Estiverne had violated the disciplinary rules and issued a public reprimand. This decision was reported in the December 1987 issue of the *Bar Journal*. The report read: "Petition for Disciplinary Action filed 6/19/86. Public Reprimand issued by Supreme Court 9/9/87. JUDGMENT FINAL. *Gist:* Asserting a position without justification which he should have known would serve merely to harass."

Before the *Bar Journal* had published its notation of the final disposition of Estiverne's case, Estiverne requested that the Bar Association publish an explanation of the charges against him and offered to pay for the necessary space in the magazine. The *Bar Journal* refused to publish the notice.

Estiverne filed suit claiming that the reports published in the magazine were defamatory and that his first amendment, equal protection, and due process rights were violated by the *Bar Journal*'s refusal to publish his reply to the charges. The district court granted summary judgment for the defendant on all three issues.

On appeal from a summary judgment, we must review the district court's decision by examining the record under the same standard which governs a district court's initial determination under Federal Rule of Civil Procedure 56(c). *Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358–59 (5th Cir.1988); *Brooks, Tarlton, Gilbert, Douglas & Kressler v. United States Fire Ins. Co.*, 832 F.2d 1358, 1364 (5th Cir.1987); *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir.1986). We may therefore affirm a summary judgment only

if "we are convinced, after an independent review of the record, that 'there is no genuine issue as to any material fact' and that the movant is 'entitled to a judgment as a matter of law.'" *Walker,* 853 F.2d at 358; *Reid* 784 F.2d at 1364. In reviewing the facts, we must draw all inferences in the manner most favorable to the nonmoving party. *Reid,* 784 F.2d at 578.

While it is not our function at the summary judgment stage to resolve disputed issues of fact, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), we will subject the legal questions raised by the parties to full appellate review if the disposition on summary judgment turns solely on questions of law. *Brooks,* 832 F.2d at 1364.

In this case, the district court held that as a matter of law, the reports published in the *Bar Journal* were not defamatory and that the *Bar Journal* had not violated Estiverne's first amendment, equal protection, or due process rights. Applying the standard of review outlined above, we conclude that the district court was correct.

## II.

### A. Plaintiff's Defamation Claim Is Without Merit.

■ The district court properly granted defendant's motion for summary judgment as to Estiverne's defamation claim. Under Louisiana law, a defamation claim consists of five essential elements: The plaintiff must prove that the defendant (1) maliciously (2) published (3) a defamatory message that (4) was false and (5) caused injury. *Rouly v. Enserch Corp.,* 835 F.2d 1127, 1129 (5th Cir.1988); *Makofsky v. Cunningham,* 576 F.2d 1223, 1235 (5th Cir. 1978). Estiverne asserts that the reports were defamatory because he was "accused ... of fraud and deceit and the Supreme Court found that there was no fraud nor deceit on [his] part." The record discloses, however, that the *Bar Journal* never reported that Estiverne was accused of fraud and deceit. The *Bar Journal* reported only the supreme court's final holding that Estiverne had "assert[ed] a position without justification." The other reports consisted solely of information regarding the status of the case. Thus, the information that Estiverne claims to be false—the charges that were not proven—was never published, while it is undisputed that the information the *Bar Journal did* report was true. In either case, Mr. Estiverne cannot prove an essential element of his claim—he necessarily fails to show either publication or falsity. The Supreme Court has held that "[i]n such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). We therefore agree with the district court that the Bar Association was entitled to summary judgment on this issue.[1]

---

1. Estiverne further claims that Article XV § 10(d) of the Articles of Incorporation of the Louisiana State Bar Association provides for publication of the names of attorneys only when they have been "suspended, disbarred or reprimanded publicly." He argues that the publication of his name before final disposition of his case by the supreme court was therefore defamatory because readers would conclude that he had been disbarred, suspended or publicly reprimanded when no such action had (yet) been taken. This assertion is frivolous given that each report clearly states the procedural progress of the case. Moreover, contrary to Mr. Estiverne's assertion, the record makes perfectly clear that the *Bar Journal* does *not* in practice publish only the names of attorneys who have been disbarred, suspended or publicly reprimanded. Rather, it publishes the names of *all* attorneys against whom disciplinary action is pending in the supreme court. Article XV § 10(e) provides that once a disciplinary proceeding is filed in the supreme court, it is a matter of public record "and publicity thereon [shall be] governed accordingly."

Estiverne suggests in his brief on appeal that "[t]he vagueness of Article XV Sections 10(d) and 10(e) caused the defendant-appellee to violate petitioner's rights under the Privacy Act." Estiverne did not challenge the validity of the Articles of Incorporation in his complaint and the district court did not decide this issue. We therefore do not decide whether Estiverne's interpretation of the Articles of Incorporation is correct or whether the Articles, if so interpreted, would violate his privacy rights. *See United States v. Ballard,* 779 F.2d 287, 295 (5th Cir.), *cert. denied,* 475 U.S. 1109, 106 S.Ct. 1518, 89

**B.** *Plaintiff's First Amendment Rights Were Not Violated.*

Estiverne also sought damages under 42 U.S.C. § 1983, claiming that the *Louisiana Bar Journal* violated his first amendment, due process, and equal protection rights by refusing to publish "his side of the story." The viability of Estiverne's claim depends in the first instance on whether the *Louisiana Bar Journal,* as the official publication of the Louisiana State Bar Association, is a state actor.[2]

One court in this circuit has held that the official publication of a state bar association is a state actor and therefore subject to suit under § 1983. *Radical Lawyers Caucus v. Pool,* 324 F.Supp. 268, 270 (W.D. Tex.1970) (*Texas Bar Journal,* as state agency, could not reject advertisement because of its political content).[3] The court noted that the *Texas Bar Journal* was "supported and subsidized by the compulsory annual dues of the State Bar, a state agency, [and was] sent to all present members of the Bar at no extra charge and to those members of the public who pay the subscription rate." *Id.* at 269.

■ The fact that a publication is sponsored by a state agency is not sufficient in itself, however, to establish state action. The presence or absence of state action turns instead on the degree of control that the state agency exercises over the publication. *See Mississippi Gay Alliance v. Goudelock,* 536 F.2d 1073, 1074–75 (5th Cir.1976) (no state action in editorial decision of college newspaper that was funded at least in part by student fees where university authorities did not exercise control over the publication, and were legally barred from doing so), *cert. denied,* 430 U.S. 982, 97 S.Ct. 1678, 52 L.Ed.2d 377 (1977); *Sinn v. The Daily Nebraskan,* 829 F.2d 662, 665 (8th Cir.1987) (no state action where safeguards prevented state from interfering with editorial decisions of college paper).

■ While the record in the instant case does not elucidate the precise nature of the relationship between the Bar Association and the *Bar Journal,* there is clearly state action with respect to the publication of the reports on disciplinary proceedings. Article XV § 10(d) of the Articles of Incorporation of the Louisiana State Bar Association provides that the Committee on Professional Responsibility shall publish in the *Bar Journal* reports on certain disciplinary actions.[4] This policy, the Bar Association argues, encourages members of the Bar to adhere to high ethical standards by informing them that violations of the disciplinary code will be punished. Publication of the reports is not, of course, the state action that is alleged to have violated Estiverne's first amendment rights. Estiverne challenges instead the *Bar Journal*'s refusal to publish his reply to the reports. The Bar Association, however, does not question the presence of state action with respect to the *Bar Journal*'s refusal to publish Estiverne's reply. Rather, it argues that the decision was intended to advance the regulatory purposes of the Bar Association—which is created and regulated under the rulemaking power of the Supreme Court of Louisiana. La.Rev.Stat.Ann. § 37:211 (West 1988). It is well established that a Bar Association, acting in its regulatory capacity, is a state actor. *E.g., Bates v. Arizona,* 433 U.S. 350, 359–60, 97 S.Ct. 2691, 2696–97, 53 L.Ed.2d 810 (1977). This case is therefore distinguishable from those in which a publication that is spon-

---

L.Ed.2d 916 (1986) (party abandoned claim by failing to brief issue adequately).

**2.** If the *Bar Journal* is not a state actor, then Estiverne's claim would necessarily fail because the first amendment precludes us from recognizing a right of reply against the private press. *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 258, 94 S.Ct. 2831, 2840, 41 L.Ed.2d 730 (1974) (right of reply statute violated first amendment rights of newspaper to exercise editorial control and judgment).

**3.** While the district court in *Allston v. Lewis,* 480 F.Supp. 328, 334 (D.S.C.1979), *aff'd mem.,* 688 F.2d 829 (4th Cir.1982), concluded that the magazine of the State Bar of South Carolina was not a public forum, it did not decide expressly whether the magazine was a state actor.

**4.** Estiverne's claim that publication of such reports prior to final disposition of the case by the state supreme court violates Article XV § 10(d) is addressed *supra* at note 1.

sored by a state agency is nonetheless sufficiently independent that its editorial decisions may not be characterized as state action.

On the undisputed record before us, we conclude that the *Bar Journal* is a state actor and that its decision not to publish Mr. Estiverne's reply is therefore subject to first amendment scrutiny.

The scope of Mr. Estiverne's first amendment rights depends on the nature of the forum to which he seeks access.[5] "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 799–800, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985). Rather, "[t]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983).

■ Although public forum analysis arose in the context of disputes over access to *places* under the control of the government, the analysis also applies to other "instrumentalities" of communication that are under government control. *Perry*, 460 U.S. at 49 n. 9, 103 S.Ct. at 957 n. 9. The Supreme Court explained in *Cornelius* that the relevant forum is defined by the "access sought by the speaker." 473 U.S. at 801, 105 S.Ct. at 3448–49. Thus, the forum need not be defined in geographic terms. It may be defined instead as the particular "means of communication" to which the speaker seeks access. *Id.*

For purposes of first amendment analysis, there are three types of forums that exist in public property: traditional public forums, forums created by government

designation ("limited public forums"), and nonpublic forums. *Id.* at 802, 105 S.Ct. at 3449.

■ Traditional public forums are places which "by long tradition or by government fiat have been devoted to assembly or debate."[6] *Id.* The state's efforts to exclude speakers from such traditional public forums are subject to rigorous first amendment scrutiny. A content-based exclusion may be enforced only when the regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that interest and a content-neutral time, place, and manner restriction may be enforced only when the regulation is narrowly tailored to achieve a significant government interest. *Perry*, 460 U.S. at 45, 103 S.Ct. at 954–55.

■ A public forum may also be created by the deliberate action of the state in opening a nontraditional forum to public discourse. *Cornelius*, 473 U.S. at 802, 105 S.Ct. at 3449. The state's power to restrict speakers' access to this category of public forum is subject to the same first amendment constraints that apply to traditional public forums. *Id.*

■ The simple fact that the government sponsors a medium of communication does not, however, automatically render that means of communication a public forum. Rather, a forum may be considered *nonpublic* where there is clear evidence that the state did not intend to create a public forum or where the nature of the property at issue is inconsistent with the expressive activity, indicating that the government did not intend to create a public forum. *Id.* at 803, 105 S.Ct. at 3450. If a forum is determined to be nonpublic, then the state may restrict access to the forum based on the subject matter of the speech and the identity of the speaker as long as the decision is reasonable and is viewpoint-neutral. *Id.* at 806, 105 S.Ct. at 3451–52; *Perry*, 460 U.S. at 46, 103 S.Ct. at 955. It is not necessary in such cases to determine

---

**5.** There is no contention here that the speech at issue is not protected by the first amendment.

**6.** These "quintessential public forums" include public parks and streets. *Perry*, 460 U.S. at 45, 103 S.Ct. at 955.

that the speech at issue is strictly incompatible with the purposes of the forum. Rather, the state's restrictions may be justified if it concludes that granting broader access to the forum would be "administratively unmanageable." *Cornelius*, 473 U.S. at 809, 105 S.Ct. at 3453.

Estiverne does not seriously contend that the *Bar Journal* is a traditional public forum, and we agree with the district court that as a matter of law it is not. The only question before us is therefore whether the *Bar Journal* is a public forum by designation or a nonpublic forum. At least one court has held that the official publication of a state bar association is a nonpublic forum. *Allston*, 480 F.Supp. at 334. While we agree with this conclusion, we believe that the first amendment issues presented here warrant a more detailed discussion and should not be obscured behind a formulaic application of the public forum doctrine.[7]

We have recognized that public forum analysis becomes more difficult as it is applied to an increasingly broad panoply of government-sponsored communication. Judge Rubin noted in *Muir v. Alabama Educ. Television Comm'n* that,

[t]he function of a state agency operating an informational medium is significant in determining first amendment restrictions on its actions. State agencies publish alumni bulletins, newsletters devoted to better farming practices, and law reviews; they operate or subsidize art museums and theater companies and student newspapers. The federal government operates the Voice of America and Radio Free Europe and Radio Liberty, publishes "journals, magazines, periodicals, and similar publications" that are "necessary in the transaction of the public business," including newspapers for branches of the Armed Forces, and pays the salaries of many federal offi-

cials who, like the President's Press Secretary, communicate with the public through the media.

688 F.2d 1033, 1050 (5th Cir.1982) (en banc) (Rubin, J., concurring) (citations omitted), *cert. denied*, 460 U.S. 1023, 103 S.Ct. 1274 (1983). While it is clear that in operating an informational medium, the state creates some sort of forum, it would be absurd to hold that the state creates a *public* forum every time it creates, operates, or sponsors a method of communication.[8] The fact that "a government facility is specifically used for the communication of information and ideas" does not mean that it is "ipso facto a public forum." *Id.* at 1041–42 (majority opinion) (citing *United States Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 130 n. 6, 101 S.Ct. 2676, 2685 n. 6, 69 L.Ed.2d 517 (1981)). "Were we to hold to the contrary, display cases in public hospitals, libraries, office buildings, military compounds, and other public facilities, immediately would become Hyde Parks open to every would-be pamphleteer and politician. This the Constitution does not require." *Perry*, 460 U.S. at 49 n. 9, 103 S.Ct. at 957 n. 9 (quoting *Lehman v. City of Shaker Heights*, 418 U.S. 298, 304, 94 S.Ct. 2714, 2718, 41 L.Ed.2d 770 (1974)).

The difficulty lies in identifying the principles that distinguish one medium of communication from another for first amendment purposes.

Estiverne essentially argues that the *Bar Journal* is a "limited public forum," designated by the state as a vehicle for expressive activities by members of the state bar. He asserts, then, that as a member of the Bar, he has a first amendment right of access to the *Bar Journal*. The Supreme Court rejected similar claims in *Lehman*, *Cornelius*, and *Perry*. In *Cornelius*, the Supreme Court held that a government-sponsored charity drive was not a public forum with respect to *all* tax-exempt orga-

---

7. Commentators have warned that rigid application of public forum analysis threatens to obscure important first amendment issues. *See, e.g.,* L. Tribe, American Constitutional Law 987–88 (1988); Farber & Nowak, *The Misleading Nature of Public Forum Analysis: Content and Context in First Amendment Adjudication,* 70 Va.L.Rev. 1219 (1984).

8. This is not to say that state actors, by virtue of being state actors, are not subject to unique first amendment constraints. *See Muir,* 688 F.2d at 1033.

nizations where the government had limited access to the drive to tax-exempt organizations that provided direct social services.[9] 473 U.S. at 804, 105 S.Ct. at 3450. Similarly, in *Perry,* the Court emphasized that while the school allowed various community groups to use the school mail system for communication, it did not open its mail system "for indiscriminate use by the general public." 460 U.S. at 47, 103 S.Ct. at 956. In *Lehman,* the Court held that the City did not create a public forum in the "car cards" in its public transportation system where access to the cards had been limited to nonpolitical advertising. 418 U.S. at 304, 94 S.Ct. at 2718.

To determine whether the government intended to create a public forum, the Supreme Court has looked to the policy and practice of the government with respect to the medium, and to the nature of the property and its compatibility with the speech at issue. *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449. The Court has held that the meeting facilities of a state university, a public school board meeting, and a municipal auditorium and city-leased theater were all intended to be forums for expressive activities by the general public or by a class of speakers. *Id.* at 802–03, 105 S.Ct. at 3448–49 (citing *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (school meeting facilities); *Madison Joint School Dist. v. Wisconsin Employment Relations Comm'n,* 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976) (school board meetings); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 555, 95 S.Ct. 1239, 1245, 43 L.Ed.2d 448 (1975) (municipal theater)).

Accordingly, we have held that "[a] facility is a public forum only if it is designed to provide a general public right of access to its use."[10] *Muir,* 688 F.2d at 1042. A number of factors are relevant to determining whether such a first amendment forum exists in public property:

> [D]oes the character of the place, the pattern of usual activity, the nature of its essential purpose and the population who take advantage of the general invitation extended make it an appropriate place for communication of views on is-

---

**9.** Justice Blackmun was particularly critical of the majority's reasoning in *Cornelius* which he characterized as circular. On the one hand, the majority noted that the state could create a public forum by designating a "place or channel of communication for use by the public at large for assembly and speech, *for use by certain speakers, or for the discussion of certain subjects.*" 473 U.S. at 802, 105 S.Ct. at 3449 (emphasis added). On the other hand, the majority concluded that the government indicated an intent *not* to create a public forum by granting access to only a narrow class of speakers. *Id.* at 813–14, 105 S.Ct. at 3455 (Blackmun, J., dissenting).

The circularity of the Supreme Court's doctrine stems perhaps from the misleading nature of the labels applied to different types of forums. A limited public forum is *not* in fact very "limited" in terms of the state's ability to restrict access to it. While the forum is "limited" in the sense that access is restricted as an initial matter to a particular class of speakers, or to particular subject matter, the state may not limit the access *of that group,* absent a compelling state interest. The circularity of the Court's analysis may arise because such unrestricted access is incompatible with the nature of many forums that would *appear* to fall into the limited public forum category as it is now defined. Rather than changing the definition of limited public forums, or altering the analysis, as Justice

Blackmun suggests, to focus more on the compatibility of the forum with the proffered speech, the Court has strained, within the present definitions, to characterize forums as *nonpublic.* The latter designation, however, is also misleading. It is essential to note that a nonpublic forum is *not* a private forum. Because it is a government-sponsored medium of communication, it is still subject to first amendment constraints that do *not* apply to the private media.

While we are sensitive to Justice Blackmun's concerns, we do not believe that they apply to our decision today. Our conclusion that the *Bar Journal* is not a "limited public forum" does not turn solely on the fact that the forum has been limited to a particularly narrow class of speakers. Rather, we conclude that the *Bar Journal* was not intended to be a forum for general expressive activity even by the class of speakers seeking access to it and that such access would not be compatible with the nature and purpose of the *Journal.*

**10.** This language does not address explicitly the concept of a "limited public forum," but is equally applicable to that context. That is, for the government to designate a medium of communication as a "limited public forum," the medium must at least be designed to provide a vehicle for expressive activity by the class of speakers claiming access.

sues of political and social significance[?]

*Id.* (citing *Southeastern Promotions, Ltd. v. City of West Palm Beach*, 457 F.2d 1016, 1019 (5th Cir.1972)). We held in *Southeastern Promotions* that a municipal theater was "a highly appropriate site for First Amendment activities [because] [t]he essential purpose and character of the municipality's auditorium is the promotion of communication and expression for the benefit of the general citizenry." 457 F.2d at 1019. We therefore concluded that the managers of the auditorium were not free to exercise "unfettered discretion to regulate the auditorium's bill of fare," and that the plaintiff's first amendment rights had been violated by the city's refusal to present the musical "Hair" in its auditorium. *Id.* at 1020.

In *Muir*, however, we applied the same standard and determined that a public television station was not a public forum. We reasoned in *Muir* that the "pattern of usual activity for public television stations is the statutorily mandated practice of the broadcast licensee exercising sole programming authority" and that "[t]he general invitation extended to the public is not to schedule programs, but to watch or decline to watch what is offered." 688 F.2d at 1042. We noted that this conclusion was consistent with the Supreme Court's doctrine regarding the public's right of access to private television stations. *Id.*

Our conclusion in *Muir* rested upon a concern that the editorial decisions of state-sponsored media ought not to be viewed "in the same manner and subjected to the same restrictions as state regulatory activity affecting speech in other areas." *Id.* at 1043. In *Muir*, as here, the state actor was *itself* engaged in expressive activity similar to that engaged in by the private press. While the first amendment does not protect government speech, it "does not prohibit the government, itself, from speaking, nor require the government to speak. Similarly, the First Amendment does not preclude the government from exercising editorial control over its own medium of expression." *Id.* at 1044 (citations omitted).

Thus, in *Muir*, we recognized that there is a constitutionally significant difference between the government's role in speaking *through* a state-sponsored medium and its role in managing a public resource that serves as an essentially passive vehicle for the expressive activities of others.[11] When the government undertakes to operate a television station or the state bar association publishes a magazine for the benefit of its members, its practice is to exercise editorial discretion similar to that exercised by a private actor managing a similar medium. Indeed, the services that the state actor undertakes to provide in these cases could not be delivered effectively without some degree of editorial discretion analogous to that exercised by the state actors' private counterparts. While the state-sponsored medium may provide a forum for some public discourse—a public television station will air some programs and a bar journal will publish some articles and advertisements—the nature and purpose of the forum is not compatible with unrestricted public access, or even with unrestricted access by a particular class of speakers. In *Muir* we emphasized that a television broadcast licensee has special responsibilities to its audience under the public interest standard. *Id.* at 1044. Similarly, although the *Bar Journal* does not operate under a regulatory scheme, it has a responsibility to serve the purposes of the Bar Association.[12] In managing such a medi-

---

11. One commentator has argued that for first amendment purposes, a distinction should be drawn between the roles of management and governance. Post, *Between Governance and Management: The History and Theory of the Public Forum*, 34 U.C.L.A. L.Rev. 1713 (1987). On this view, public forum doctrine "permits the state to manage speech within its own institutions, but it prohibits the state from attempting to manage the first amendment claims of members of the general public respecting resources that lie within the public realm." *Id.* at 1801.

12. Estiverne could attempt to distinguish *Muir* on the ground that the *Bar Journal* has a more interactive relationship with its audience than does a public television station. It may be true that the *Journal* accepts comparatively more submissions from its "audience" than does a

um, the state agency "must necessarily make discriminating choices," sometimes based on content, as to what material to air or to publish.[13] *Id.*

The same cannot be said "where the government sponsors ... certain facilities through the use of which *others* are allowed to communicate and to exercise their own right of expression." *Id.* at 1043 (emphasis added). Where a forum serves as an essentially passive vehicle for expressive activity by the public, or by a particular class of speakers, unrestricted access is not "incompatible with the facility's primary activity." *Id.* at 1042. Thus, while the managers of a municipal theater must,

for example, make scheduling decisions, the managers need not, and indeed may not, exercise the same degree of discretion that is necessary to operate a magazine or a television station effectively.[14] Content-based considerations have properly been held to have no place in such decisions, absent a compelling governmental interest. *Cornelius,* 473 U.S. at 800, 105 S.Ct. at 3448; *Perry,* 460 U.S. at 45, 103 S.Ct. at 954–55.

The distinction we recognized in *Muir* is consistent with the Supreme Court's holdings in *Lehman, Cornelius* and *Perry.* In each case the Court emphasized that the

public television station—there may be more lawyers who submit articles than there are producers of television programs who submit their work to a station. However, the essential nature of the two forums is similar. Unlike the forums which have been held to be public forums (limited or otherwise) a television station or a magazine is *not* a *passive* vehicle for expressive activities by others. While both mediums, as noted above, provide a forum for some expressive activity, they do so within the framework of serving a more instrumental governmental purpose—which could not be accomplished without the exercise of editorial discretion.

In this respect, a government-sponsored magazine or television station is even more clearly a nonpublic forum than was the charity drive in *Cornelius,* the school mail system in *Perry,* or the "car cards" in *Lehman*—all of which were essentially passive vehicles for the expressive activity of others.

We could of course, envision a television station or publication that might not require this degree of editorial discretion—that would in fact be a passive vehicle for the expressive activities of others. While the Supreme Court has not yet decided the issue, it is possible that public-access cable television would be considered to be such a forum, as might the "print" equivalent.

**13.** While Estiverne could attempt to distinguish his case by arguing that his demand to place an ad does not implicate editorial discretion, this distinction is not persuasive. Even if we could sever the advertising component of the *Journal* from the remainder of the magazine for the purposes of this analysis, we are left with the precise facts of *Lehman* in which the Court held that the fact that the city had made advertising space available in its public transit system did not create a limited public forum with respect to all advertisers. 418 U.S. at 304, 94 S.Ct. at 2718.

To hold otherwise would prohibit the *Journal* from making any content-based distinctions among proffered advertising unless those dis-

tinctions were necessary to achieve a compelling governmental interest. Here, as in *Lehman,* the fact that a state actor has allowed *some* advertising through its medium of communication does not transform that medium into an open forum.

**14.** One commentator proposes that, "where the government's mission is to communicate and the scarcity of resources make editorial selectivity inevitable, the state need not tolerate or acquiesce in use of the forum that substantially destroys the communication and editorial processes." M. Yudof, When Government Speaks 241 (1983), cited in L. Tribe, American Constitutional Law 810 n. 18 (1988). Professor Tribe states that the "circularity of this argument is troubling," and notes specifically the difficulty in distinguishing a government-sponsored publication from the municipal theater at issue in *Southeastern Promotions. Id.*

It *is* conceivable, as Professor Tribe suggests, that a city could announce at the outset of its construction of a theater, that the forum was to be used "only for 'non-offensive' or 'truly artistic' productions." *Id.* While this hypothetical presents a hard case for public forum analysis, we do not believe that our decision today would compel a holding that a municipal theater could be transformed into a nonpublic forum simply by the government's announcement that it is not intended to *be* a public forum. That determination would depend on a complex of factors, including not only the government's policy and practice with respect to the forum, but also the *nature* of the forum itself and its compatibility with the expressive activity at issue. *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449.

We note that few attempts to reformulate public forum analysis have succeeded in eliminating all ambiguity in the doctrine. *See, e.g.,* Post, *supra* note 11 at 1801–09 (proposing that Court look to social practices with respect to various forums, but noting that such practices are necessarily malleable).

medium at issue was not intended to be used by the public to exercise its own right of expression, but was intended instead to serve a narrower, instrumental purpose of the state agency in question—a purpose, moreover, that was incompatible with unrestricted access with respect to even a particular class of speakers. Thus, the Court held in *Lehman* that the "car cards" were "part of the commercial venture" of providing transportation to citizens. "In much the same way that a newspaper or periodical, or even a radio or television station, need not accept every proffer of advertising from the general public, a city transit system has discretion to develop and make reasonable choices concerning the type of advertising that may be displayed in its vehicles."[15] 418 U.S. at 303, 94 S.Ct. at 2717. The government's decision to restrict access to the cards was characterized as a "managerial decision." *Id.* at 304, 94 S.Ct. at 2718.

Similarly, the Court in *Cornelius* stressed the government's prerogatives *as an employer* and drew an analogy to the discretion exercised by the government's private counterparts: "The federal workplace, like any place of employment, exists to accomplish the business of the employer.... '[T]he government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs.'" *Cornelius*, 473 U.S. at 805–06, 105 S.Ct. at 3451 (citation omitted). While the Court did not expressly rely on this point in concluding that the school mail service at issue in *Perry* was not a public forum, the rationale is implicit in the Court's conclusion that as a matter of labor-management relations, the school district could restrict access to the mail service to the teachers' official bargaining representative.[16] 460 U.S. at 51, 103 S.Ct. at 958.

We conclude that the *Louisiana Bar Journal*, as the trade publication of the Louisiana Bar, similarly serves a narrow, instrumental role. It was not established as an open forum for the expressive activities of the public, or of all members of the Bar. Rather, the invitation extended to the public is to *submit* articles and advertisements for consideration by the editorial board, within the framework of editorial discretion necessary to fulfill the magazine's purposes. *See Allston*, 480 F.Supp. at 334 (newspaper published by South Carolina Bar Association was trade publication and not a first amendment forum). Estiverne has adduced no evidence to show that the policy and practice of the Bar Association has been to treat the *Bar Journal* as a public forum—even with respect to members of the Bar. *Cornelius*, 473 U.S. at 802, 105 S.Ct. at 3449. Moreover, the "right of reply" that he seeks is not compatible with the nature and purposes of the magazine. *Id.* In order to fulfill the *Bar Journal*'s purposes as a trade journal, its editors must have some degree of discretion analogous to that exercised by editors of private trade journals—with respect to both articles and advertisements. *See Muir*, 688 F.2d at 1044; *see also Cornelius*, 473 U.S. at 805–06, 105 S.Ct. at 3451; *Lehman*, 418 U.S. at 303, 94 S.Ct. at 2717. The district court therefore properly held that the *Bar Journal* is a nonpublic forum.

■ It is important to note that this holding does not vest the editors of the *Bar Journal* with unfettered editorial discretion. As a state actor, the *Bar Journal*

---

**15.** Estiverne asserts that *Lehman* is inapposite because the speech at issue in that case was commercial, and therefore less protected than the "right of reply" that he seeks. This argument misunderstands public forum analysis. The analysis applies equally to all protected speech: the character of the forum determines "the extent to which the Government may limit access"—whether the proffered speech is commercial speech, or other protected speech. *See Cornelius*, 473 U.S. at 788, 105 S.Ct. at 3439. While the speech involved in *Lehman* was commercial, the speech involved in *Perry* was not.

Nevertheless, the Court concluded in both cases that because the relevant forum was nonpublic, the government could restrict speakers' access to the forum, subject to less stringent first amendment constraints than would apply to a public forum.

**16.** Indeed, the Court observed that it could be considered an unfair labor practice for the federal government to grant a rival union access to internal communication facilities. 460 U.S. at 51 n. 11, 103 S.Ct. at 958 n. 11.

is subject to first amendment constraints that do not apply to the private press. While a state actor may restrict access to a nonpublic forum based on the content of the speech or the identity of the speaker, its regulations must be reasonable in light of the purposes served by the forum. *Cornelius,* 473 U.S. at 806, 105 S.Ct. at 3451–52; *Perry,* 460 U.S. at 46, 103 S.Ct. at 955. The policies and practices governing access to the forum may not be arbitrary, capricious, or invidious. *Lehman,* 418 U.S. at 303, 94 S.Ct. at 2717. Moreover, a state actor may not deny access to a nonpublic forum on the basis of the viewpoint of the proffered speech. *Cornelius,* 473 U.S. at 806, 105 S.Ct. at 3451–52; *Perry,* 460 U.S. at 46, 103 S.Ct. at 955–56. These constraints are consistent both with the special obligations of fairness that are properly imposed on state actors and with the practical necessities of operating the sort of medium at issue.

▪ We conclude that the *Bar Journal*'s refusal to publish Mr. Estiverne's reply was reasonable in light of the purpose of the forum.[17] The reports on the disciplinary proceedings against Mr. Esti-

verne were published only after a petition for disciplinary action had been filed in the state supreme court and had therefore become a matter of public record. The record discloses further that the report on the proceedings against Mr. Estiverne differed in no way from reports on similar proceedings pending against other attorneys. The Bar Association maintains that its policy of publishing a list of disciplinary petitions filed in the supreme court and of not publishing an attorney's version of the charges against him or her is rationally related to the objectives of Article XV of the Articles of Incorporation of the Louisiana State Bar Association which governs disciplinary actions against attorneys. The purpose of the reports is to encourage adherence to the disciplinary rules by warning attorneys that the rules are enforced. The Bar Association could reasonably conclude that allowing attorneys to purchase space in the magazine to reply to the charges against them would be inconsistent with the Bar Association's limited purpose in publishing the information about disciplinary proceedings in the first instance. *See Allston,* 480

---

**17.** Estiverne does not claim explicitly that the *Bar Journal*'s refusal to publish his response constituted viewpoint discrimination. The *Bar Journal*'s refusal to publish Estiverne's reply is more properly characterized as a content-based, rather than viewpoint-based distinction. First, as noted above, it is not the case that the *Journal* publishes the responses of some attorneys while refusing to publish the responses of others. Second, with respect to the policy taken as a whole, the *Journal* does not express a particular view on the disciplinary proceedings; it simply publishes factual reports of the progress and conclusions of such proceedings—all of which are a matter of public record. Allowing attorneys to publish their own replies would in a sense establish an imbalance on the other side because the Committee on Professional Responsibility does not provide an analysis of the merits of a case. In granting Estiverne's demand, the *Journal* would not only be compelled to publish all similar responses, it could also be compelled to publish similar commentary by the parties aggrieved by an attorney's ethical violations (to publish only the attorneys' views could also be viewpoint discrimination). Given that the disciplinary proceedings themselves are intended to be the forum for resolving these disputes, the *Bar Journal*'s reluctance to open its publication to a re-argument of these issues is reasonable.

Moreover, to the extent that Estiverne *could* argue that the *Journal*'s publication of the reports constitutes adoption of a particular viewpoint, his argument again runs into adverse Supreme Court precedent. The *Journal*'s actions here are directly analogous to those of the school district in *Perry.* In *Perry,* the Court rejected the plaintiffs' argument that the school district's refusal to allow a Teachers' Association access to the school mail system constituted viewpoint discrimination—even though the school district's agreement to allow exclusive access to the teachers' official bargaining representative could be construed as discriminating against the viewpoint of the rival union. 460 U.S. 37, 49 & n. 9, 103 S.Ct. 948, 957 & n. 9. In the same way that the one union's status as official bargaining representative made it permissible for the school district to refuse a rival union access to the mail system, *id.,* the *Bar Journal*'s status as the official publication of the Bar Association would allow it to publish factual reports of the Committee on Professional Responsibility without publishing responses by disciplined attorneys. Allowing the Committee on Professional Responsibility to publish its reports in the *Bar Journal* enables the Bar Association to "perform effectively its obligations" to promote adherence to the Code of Professional Responsibility. *Id.* at 51, 103 S.Ct. at 958.

F.Supp. at 334 (finding reasonable relation between rejection of advertisement by Bar Association newspaper and editorial policy that sought to avoid 'gray areas' of professional ethics and to retain informational character of publication). The *Bar Journal* could conclude, moreover, that it would be "administratively unmanageable" to allow attorneys to respond to such reports. *Cornelius*, 473 U.S. at 809, 105 S.Ct. at 3453. Having granted one such request, the magazine could be compelled to grant access to every other attorney who demanded the same right to reply.

We agree furthermore with the district court's holding that the *Bar Journal*'s refusal to publish Estiverne's reply was not arbitrary, capricious, or invidious. The record contains undisputed testimony that the *Bar Journal* has never published an attorney's response to disciplinary proceedings against him or her. Mr. Estiverne has adduced no evidence whatsoever that the *Bar Journal* treated him differently from any similarly situated attorney.[18]

### C. *Plaintiff's Due Process and Equal Protection Rights Were Not Violated.*

 Finally, we agree with the district court that Estiverne's equal protection and due process claims fare no better than his first amendment claims. Since we hold that as a matter of law Mr. Estiverne had no first amendment right of access to the *Bar Journal*, the *Bar Journal*'s refusal to publish his reply does not burden a fundamental right of Estiverne. *Perry*, 460 U.S. at 54, 103 S.Ct. at 959–60. Because the *Bar Journal* is not a public forum, its editors may draw distinctions between speakers and subjects as long as those distinctions are rationally related to the special purpose of the *Bar Journal*. *Id.* at 55, 103 S.Ct. at 960. We hold, as we did

with respect to the first amendment claim, that the *Bar Journal*'s refusal to publish Estiverne's reply was rationally related to the magazine's aim of fostering high ethical standards in the legal profession and in retaining the informational character of the publication.[19] *See id.; Allston*, 480 F.Supp. at 334.

Our holding that Estiverne had no first amendment right of access to the *Bar Journal* similarly defeats his due process claim. For the reasons explained above, the *Bar Journal*'s decision did not deprive Estiverne of his liberty interest in free speech.

### III.

We hold that the district court properly granted summary judgment to defendant on each of the issues in this case. First, summary judgment on the defamation claim was appropriate because plaintiff could not establish an essential element of his claim. Second, the *Louisiana Bar Journal* is not, as a matter of law, a public forum and the *Bar Journal*'s refusal to grant plaintiff access to the *Bar Journal* to respond to disciplinary charges against him was reasonable. Finally, plaintiff's due process and equal protection rights were not violated.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

**18.** This holding is consistent with that of the district court in *Radical Lawyers*. The court in that case rejected as unpersuasive the *Texas Bar Journal*'s argument that it had refused to publish an advertisement by an organization opposed to the Vietnam War because it had a policy against accepting political advertisements. The court found that the *Texas Bar Journal* had in fact accepted political advertisements in the past and had published other materials taking a position on the War. 324 F.Supp. at 270.

**19.** Estiverne relies on *Radical Lawyers* to support his assertion that his equal protection and due process rights were violated because the *Bar Journal* accepts other forms of advertising. As explained in note 18 *supra, Radical Lawyers* is readily distinguishable.