Charles L. MOORE and Michelle
E. Moore, Plaintiffs,

v.

CITY OF VAN, TEXAS, Mayor E.L. Raulston, Aldermen Albert McCarty, Jackie Nations, Linzy Neal, Jack Perry, in their official capacities, Defendants.

No. 6:02–CV–400.

United States District Court,
E.D. Texas,
Tyler Division.

Jan. 7, 2003.

David Andrew Cortman, American Center for Law & Justice, Lawrenceville, GA, Gregory N. Bryl, Robert W. Ash, Stuart Jonathan Roth, American Center For Law & Justice, Washington, DC, for Plaintiffs.

Darrell G–M Noga, Roberts & Smaby, Dallas, TX, for Defendants.

### MEMORANDUM OPINION AND ORDER

DAVIS, District Judge.

On October 11, 2002, Plaintiffs Charles L. Moore ("Mr.Moore")and Michelle E. Moore ("Mrs. Moore") (collectively "Plaintiffs") filed a Motion and Supporting Memorandum for Preliminary Judgment Pursuant to Federal Rule of Civil Procedure 65 (Docket No. 15). On November 8, 2002, Defendants City of Van, Texas (the "City"), Mayor E.L. Raulston ("Mayor Raulston"), Aldermen Albert McCarty, Jackie Nations, Linzy Neal, and Jack Perry, each individual Defendant sued only in their respective official capacities (collectively "Defendants"), filed a Response (Docket No. 20). On November 18, 2002, Plaintiffs filed a Reply (Docket No. 25). An evidentiary hearing was held on December 17, 2002. At the hearing, the Court suggested a consolidation of the hearing with a trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). The parties agreed that all facts and applicable law were before the Court, and this action was ripe for full adjudication on its merits without the need for further trial. After consideration of the parties' submissions, the admissible evidence, and the applicable law, the Court makes the following findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure.[1]

### BACKGROUND

The City has adopted a facilities use policy (the "Policy") for use of the Van Community Center ("Center"), which permits use of the Center by "residents of the City of Van and the Van Independent School District," and to non-residents in certain situations.[2] *See* Pls.' Ex. A. Pursu-

---

1. To the extent that any conclusion of law is deemed to be a finding of fact, it is adopted as such; and likewise, any finding of fact that is deemed to be a conclusion of law is so adopted.

2. The Policy provides, in pertinent part:

   The Van Community Center is for the use of *residents* of the City of Van and the Van Independent School District [VISD]. On an individual case basis exceptions may be considered in the following cases provided it does not deprive a resident of the use of the center:
   1. A non-resident of VISD who owns property and pays taxes to the City of Van, or
   2. A non-resident of VISD who has friends/relatives who reside in VISD and will be attending the event.

ant to the Policy, Defendants have permitted a number of events, including, among others: Kiwanis Club meetings, Super Bowl parties, wedding parties, wedding showers, dance classes, family reunions, graduation parties, scouting activities, and Thanksgiving and Christmas parties. *See* Pls.' Ex. B.[3] The Policy, on its face, does not contain exclusions. Nevertheless, the City has been consistent in denying use of the Center for religious purposes.[4]

All applications to use the Center go through Patricia Ann Pickard ("Pickard"), manager of the Center, who collects the registration form, which includes name, telephone number, address, and type of event. In 1995, Mayor Raulston informed Pickard that the Center was not to be used for religious services or religious purposes. *See* Pls.' Ex. K, at 47. If through a conversation with a potential applicant or through the application itself, Pickard determines that the event is questionable, *i.e.*, any event with religion involved, she informs the applicant that the Center cannot be used for religious purposes, denies the application and, refers the applicant to Mayor Raulston for further discussion.

On January 19, 2002, Mrs. Moore, who lives within the Van Independent School District, applied for permission to use the Center for a "family gathering." The application was granted and, on February 1, 2002, the Plaintiffs' along with a group of 80–100 local residents, who learned of the event through word of mouth, held a meeting at the Center. The February 1, 2002,

meeting lasted for three hours and consisted of singing songs, praying for the local community, and informal discussions on issues such as the conditions of schools, the safety of students, and the need to be role models for individuals within the community. The City was unaware that Plaintiffs used the Center for religious purposes.[5]

On February 4, 2002, Mrs. Moore went back to the Center to reserve it for the first Friday night of every month. At the Center, she spoke with Pickard. During this conversation, Pickard asked Mrs. Moore what type of event was she going to have at the Center and Mrs Moore replied "prayer for the community." *See* Pls.' Ex. O, at 28. Pickard informed Mrs. Moore that the Center could not be used for religious gatherings and referred Mrs. Moore to Mayor Raulston if she had a problem with this position. On February 5, 2002, Mr. Moore spoke with Mayor Raulston requesting to use the Center again for an event similar to the February 1, 2002, meeting. The event was to contain a message and discussions about improving local schools, ensuring safety of students, helping local businesses, engaging in community service, and becoming better role models for local residents and their children, all from a Biblical perspective, in addition to singing religious songs, and praying about issues the residents faced. *See* Mr. Moore Decl. ¶¶ 6–7, 14.

---

Pls.' Ex. A.

**3.** Other events include: potluck dinners, Meals on Wheels activities, Tae Kwon Do classes, AAPR meetings, senior citizen games, soccer meetings, genealogy seminars, anniversary parties, Fines Arts Club meetings, quilt shows, baseball coaches meetings, and fundraising events. *See* Pls.' Exs. B, J, & I.

**4.** There was evidence that the City denied permission to use the Center to a group of Mormons.

**5.** The City only looks to the face of the application when determining whether to grant permission. Here, Mrs. Moore wrote "family gathering" on the application. The City does not investigate whether the applicant actually uses the Center for the purpose stated in the application.

Sometime before February 12, 2002, Mr. Moore personally visited with Mayor Raulston at his office to clarify the City's position regarding the "unwritten 'no religious use' policy." On February 13, 2002, Mr. Moore sent a letter to Mayor Raulston and City Council members requesting that they reverse the denial of the use of the Center by the Plaintiffs. On February 15, 2002, Mayor Raulston sent the Plaintiffs a letter denying their application and stating that the "Van Community Center is not available for any type of religious service meetings." *See* Pls.' Ex. D. On April 4, 2002, the Van City Council met in a Regular Session and discussed Plaintiffs' application. The Van City Council, after consultation with the city attorney, unanimously passed a motion to exclude religious services from the Van Community Center. Subsequently, on August 19, 2002, Plaintiffs filed this lawsuit against the Defendants for violations of their rights to free speech, equal protection, free exercise of religion, due process, and the right to be free from establishment of religion under the First and Fourteenth Amendments. Plaintiffs seek declaratory and injunctive relief. Specifically, Plaintiffs complain that by applying their Policy to exclude only religious speech, Defendants have engaged in unconstitutional content and viewpoint-based discrimination.

## FIRST AMENDMENT ANALYSIS

As an initial matter, the Court must determine that the expression at issue is protected under the First Amendment.[6] The Plaintiffs have alleged that by applying their Policy to exclude only religious speech, Defendants have violated the First Amendment. It is clear that religious speech is protected under the First Amendment. *See, e.g., Good News Club v. Milford Cent. Sch.,* 533 U.S. 98, 110, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001); *Widmar v. Vincent,* 454 U.S. 263, 269, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). In *Capitol Square Review and Advisory Bd. v. Pinette,* 515 U.S. 753, 760, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995), the Supreme Court expounded: "[o]ur precedent establishes that private religious speech ... is as fully protected under the Free Speech Clause as secular private expression." *Id.;* 515 U.S. 753, 115 S.Ct. 2440 (citations omitted). The First Amendment protects religious speech, including "religious proselytizing" and "acts of worship." *Id.* at 760–61; 115 S.Ct. 2440 (citations omitted). As neither party seriously contests this issue, the Court turns to an evaluation of the speech Policy implicated by Plaintiffs' allegations.

### Overview of Forum Analysis

Once the Court has confirmed that the speech at issue is "protected speech" for purposes of Free Speech Clause analysis, the Court must look at the relevant forum and then, depending on the forum's classification, apply the relevant standard of Free Speech Clause review. *See, e.g., Good News Club,* 533 U.S. at 106, 121 S.Ct. 2093 ("The standards that we apply to determine whether a State has unconstitutionally excluded a private speaker from use of a public forum depend on the nature of the forum."); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 44, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) ("The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated

---

**6.** In pertinent part, the First Amendment provides that "Congress shall make no law ... abridging freedom of speech, or of the press." U.S. Const. amend I. It applies to the states by virtue of the Fourteenth Amendment. *See Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925).

differ depending on the character of the property at issue."). Thus, the Court turns next to the identification of the relevant forum.

Identification of the forum requires that the Court consider (1) the government property on which access is sought and (2) the type of access sought. *See Cornelius v. NAACP Legal Def. and Educ. Fund, Inc.*, 473 U.S. 788, 801, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) ("[F]orum analysis is not completed merely by identifying the government property at issue. Rather, in defining the forum [,] we have [also] focused on the access sought by the speaker."). Here, the government property at issue is the Center. The access sought is to use the Center as a meeting place for discussions about improving local schools, ensuring safety of students, helping local businesses, engaging in community service, and becoming better role models for local residents and their children, all from a Biblical perspective, in addition to singing religious songs, and praying about issues the residents faced. *See* Mr. Moore Decl. ¶¶ 6–7, 14.

### Type of Forum Created

The Supreme Court has espoused a tripartite forum-based framework to analyze First Amendment issues regarding governmentally owned property. The Supreme Court has identified three types of fora: (1) the traditional public forum; (2) nonpublic forum; and (3) public forum created by a government designation. *Perry*, 460 U.S. at 45–46, 103 S.Ct. 948.

#### i) *Traditional Public Forum*

Traditional public forums are places that " 'by long tradition or by government fiat have been devoted to assembly or de-

bate.' " *Estiverne v. La. State Bar Ass'n*, 863 F.2d 371, 376 (5th Cir.1989) (quoting *Cornelius*, 473 U.S. at 802, 105 S.Ct. 3439).[7] "The state's efforts to exclude speakers from such traditional public forums are subject to rigorous first amendment scrutiny." *Estiverne*, 863 F.2d at 376. Thus, the state regulation must withstand strict scrutiny; that is, show that a content-based restriction serves a compelling state interest and is narrowly tailored. *Perry*, 460 U.S. at 45, 103 S.Ct. 948.

#### ii) *Nonpublic Forum*

The second category is a nonpublic forum which is public property that is not by tradition or designation open for public communication. *See Estiverne*, 863 F.2d at 376 (citing *Cornelius*, 473 U.S. at 803, 105 S.Ct. 3439) ("[A] forum may be considered nonpublic where there is clear evidence that the state did not intent to create a public forum or where the nature of the property at issue is inconsistent with the expressive activity, indicating that the government did not intend to create a public forum."). A nonpublic forum is still subject to First Amendment restraints, "[t]he government can restrict access to a nonpublic forum 'as long as the restrictions are reasonable and [are] not an effort to suppress expression merely because public officials oppose the speakers view.' " *Ark. Educ. Television Comm'n*, 523 U.S. at 677–78, 118 S.Ct. 1633 (quoting *Cornelius*, 473 U.S. at 800, 105 S.Ct. 3439). "Control over access to a nonpublic forum can be based on subject matter and speaker identity as long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806, 105 S.Ct. 3439. The Supreme Court has placed many

---

**7.** These "quintessential public forums" include public parks and streets. *Perry*, 460 U.S. at 45, 103 S.Ct. 948.

types of government property in this category, *inter alia*, open areas of a military base,[8] household mail boxes,[9] a public school's internal mail system,[10] the federal government's annual charity drive,[11] a public high school newspaper,[12] sidewalk areas around a post office,[13] and airport terminals.[14]

### iii) *Public Forum Created by Government Designation—Designated Public Forum or Limited Public Forum*

A designated public forum is a forum "created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Cornelius*, 473 U.S. at 802, 105 S.Ct. 3439 (explaining that a designated public forum exists when the government "intentionally open[s] a nontraditional [public] forum for public discourse"). The government's power "to restrict speakers' access to this category of public forum is subject to the same first amendment constraints that apply to traditional public forums." *Estiverne*, 863 F.2d at 376. Thus, any content-based prohibition is subject to strict scrutiny and, therefore, permissible only if it is necessary to serve a compelling state interest and is drawn narrowly to achieve that interest. *See Cornelius*, 473 U.S. at 800, 105 S.Ct. 3439. The Supreme Court has determined that a number of government properties fall within this category, including, *inter alia*, university meeting facilities generally open for use by student groups,[15] a school board meeting open to the public,[16] and municipal auditorium and city-leased theater designed for and dedicated to expressive activities.[17]

As several circuits have noted, including the Fifth Circuit, there is some confusion over the terminology used to describe this category. *See Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 345–46 (5th Cir.2001). The Supreme Court and lower courts have consistently used two terms to describe this category—"designated public forum" and "limited public forum." *See id.* (citations omitted). This lack of clarity has created an analytical ambiguity. The levels of scrutiny applied to government regulation of speech in a limited public forum differ from that applied to the regulation of speech in a designated public forum. *Compare Good News Club*, 533 U.S. at 106–07, 121 S.Ct. 2093 (the government may restrict the expression that takes place within a limited public forum as long as the restriction (1) does "not discriminate against speech on the basis of view-

---

**8.** *See Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976).

**9.** *See United States Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981).

**10.** *See Perry*, 460 U.S. at 48, 103 S.Ct. 948.

**11.** *See Cornelius*, 473 U.S. at 806, 105 S.Ct. 3439.

**12.** *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 269–70, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988).

**13.** *See United States v. Kokinda*, 497 U.S. 720, 726, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990).

**14.** *See Int'l Soc. for Krishna Consciousness v. Lee*, 505 U.S. 672, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992).

**15.** *See Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981).

**16.** *See Madison Joint Sch. Dist. v. Wisconsin Employment Relations Comm'n*, 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976).

**17.** *See Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975); *see also Perry*, 460 U.S. at 45–46, 103 S.Ct. 948.

point" and (2) is "reasonable in light of the purpose served by the forum.") *with Cornelius,* 473 U.S. at 800, 105 S.Ct. 3439. (in a designated public forum, any content-based prohibition is subject to strict scrutiny and, therefore, permissible only if it is necessary to serve a compelling state interest and is drawn narrowly to achieve that interest). The Fifth Circuit has stated "it now seems clear that the two terms are not synonymous and should not be used interchangeably." *Id.* at 346. Thus, the Court will distinguish between a designated public forum and a limited public forum and their respective tests.

In distinguishing a designated public forum from a limited public forum, the Fifth Circuit has focused on two factors: (1) "the government's intent with respect to the forum," and (2) " 'the nature of the [forum] and its compatibility with the speech at issue.' " *Chiu,* 260 F.3d at 346 (citing *Estiverne,* 863 F.2d at 378). The government does not create a designated public forum "by permitting limited discourse" or "selective access." *Ark. Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 677, 679, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998). The government creates a designated public forum "only by intentionally opening a nontraditional forum for public discourse." *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449. In other words, the government must have, "by policy or practice," opened its facilities "for indiscriminate use by the general public," in order for it to be a designated public forum and, thus, subject to strict scrutiny. *Perry,* 460 U.S. at 47, 103 S.Ct. 948.

With regard to limited public forums, the Supreme Court has stated that the government may restrict the expression that takes place within the forum as long as the restriction (1) does "not discriminate against speech on the basis of viewpoint" and (2) is "reasonable in light of the purpose served by the forum." *Good News Club,* 533 U.S. at 106–07, 121 S.Ct. 2093. The Supreme Court in *Good News Club* stated that "[w]hen the State established a limited public forum, the State is not required to and does not allow persons to engage in every type of speech. The State may be justified 'in reserving [its forum] for certain groups or for the discussion of certain topics.' " 533 U.S. at 106, 121 S.Ct. 2093 (quoting *Rosenberger v. Rector and Visitors of Univ. of Virginia,* 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995)). To date, the Supreme Court has recognized two types of government property that are clearly limited public forums: public school facilities during after-school hours[18] and a student activities fund of a public university.[19]

### Application of Forum Analysis

The Center is not a traditional public forum, nor is it a nonpublic forum. The more difficult question is whether the Center is a designated public forum and, thus, subject to strict scrutiny, or a limited public forum and, thus, not subject to strict scrutiny. The Plaintiffs argue that the Center is properly classified as a designated public forum, while the Defendants contend that it is at most, a limited public forum. To avoid strict scrutiny, the City's Policy must not have created a designated public forum.

#### i) *Designated Public Forum*

■ Although a community center is not *per se* a public forum, a city may designate it as such by indiscriminately permitting

---

**18.** *See Good News Club,* 533 U.S. at 106, 121 S.Ct. 2093; *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* 508 U.S. 384, 392–93, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993).

**19.** *See Rosenberger,* 515 U.S. at 829–30, 115 S.Ct. 2510.

use by the public at large for assembly and speech. At some defining point, the city's allowance of a sufficiently wide variety of uses creates a designated public forum. *See, e.g., Lamb's Chapel,* 508 U.S. at 391–92 & n. 5, 113 S.Ct. 2141. In cases where courts have held that schools had created a designated public forum, the school's access policy was completely open except for a religious prohibition. *See, e.g., Widmar,* 454 U.S. at 265, 102 S.Ct. 269. In *Concerned Women for Am., Inc. v. Lafayette County,* 883 F.2d 32, 33–34 (5th Cir.1989) (hereinafter *"CWA"*), the Fifth Circuit found a designated public forum where a library auditorium was "open for use of groups or organizations of a civic, cultural or educational character," even though, the library has a policy prohibiting "meetings for social, political, partisan or religious purposes." *Id.*

The Court finds that the Center is a designated public forum. First, the City's Policy, by its express language, states that the "Center is for the use of residents of the [community]." *See* Pls.' Ex. A. This reveals an intent to open the Center up to myriad events conducted by individuals and community organizations. *Cf. CWA,* 883 F.2d at 33 (library forum). Therefore, the City's Policy alone is sufficient to find that the Center is a designated public forum.

In addition to the Policy, the past practices of the City regarding use of the Center are also relevant in determining the nature of the forum. *See Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439 ("[T]he Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum."). The City's practice reveals that it has opened the Center to a wide array of community events. *See* Pls.' Ex. B. Consequently, the City has by poli-

cy and practice opened its facilities "for indiscriminate use by the general public." *Perry,* 460 U.S. at 47, 103 S.Ct. 948. *Cf. Hazelwood School Dist.,* 484 U.S. at 267, 108 S.Ct. 562 (government facilities become designated public forums if "by policy or practice school officials have opened those facilities for indiscriminate use by the general public ... or by some segment of the public.") (citations omitted).

"It is an elementary rule that the government may not exclude speech on the basis of its content from either a traditional public forum or a forum created by government designation, unless the exclusion is necessary to serve a compelling state interest which cannot be served by a less restrictive action." *CWA,* 883 F.2d at 34–35 (citing *Cornelius,* 473 U.S. at 803, 105 S.Ct. at 3449); *Widmar,* 454 U.S. at 270, 102 S.Ct. 269; *see also Estiverne,* 863 F.2d at 376. In order to justify discriminatory exclusion from a designated public forum on the religious nature of a group's intended speech, the City must satisfy the standard of review required for content-based exclusions. Thus, the City must show that its regulation is necessary to serve a compelling state interest and that it is narrowly tailored to achieve that end. *See Widmar,* 454 U.S. at 270, 102 S.Ct. 269.

■ Defendants have failed to show a compelling interest and their Establishment Clause defense, as discussed below, is unavailing. The City's Policy is unconstitutional as applied to Plaintiffs. Pursuant to the Policy, Defendants denied Plaintiffs' request to conduct a community event because the event was to contain a religious message, religious songs, and prayer. *See* Pls.' Ex. D ("religious service meeting"). Thus, the Policy selectively excludes uses containing religious speech from a designated public forum based on

the content of those uses. *Cf. CWA*, 883 F.2d at 35.

In *Widmar*, the Supreme Court stated that discrimination on the basis of religion in a public forum constitutes forbidden content-based discrimination. *Widmar*, 454 U.S. at 269–70, 102 S.Ct. 269. In *Widmar*, numerous student groups were permitted to use the forum (university buildings) for various purposes, while the plaintiff's group meetings consisting of "prayer, hymns, Bible commentary, and discussion of religious views and experiences," were excluded. *Id.* at 265 n. 2, 102 S.Ct. 269. The Court held that the university unconstitutionally "discriminated against student groups and speakers based on their desire to use a generally open forum to engage in religious worship and discussion." *Id.* at 269, 102 S.Ct. 269. The Court explained that the "Constitution forbids a State to enforce certain exclusions from a forum generally open to the public, even if it was not required to create the forum in the first place." *Id.* at 268, 102 S.Ct. 269.

Similarly, in *CWA*, the Fifth Circuit held that a public library could not exclude from its auditorium open to the public a group wishing to use it for religious purposes. *CWA*, 883 F.2d at 34. In *CWA*, a regional library opened its facility "for use of groups or organizations of a civic, cultural or educational character," and then attempted to prohibit "meetings for social, political, partisan or religious purposes." *Id.* at 33. The library refused to permit plaintiffs from using the auditorium for meetings where individuals would "discuss family and political issues, pray about those issues, and seek and apply Biblical principles to them." *Id.* at 33–34. The Court found the exclusion of such meetings to be impermissible content discrimination, and affirmed the grant of a preliminary

injunction against the public library. *Id.* at 34–35.

There is no evidence that Plaintiffs' meeting would disrupt or interfere with the general use of the Center. Should the contrary prove true, City officials may respond by imposing reasonable time, place, or manner restrictions on access to the Center, provided any regulations are justified without reference to the content of the regulated speech. *See, e.g., Ward v. Rock Against Racism*, 491 U.S. 781, 790–94, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).

### ii) *Limited Public Forum*

■ Even assuming that the Center is a limited public forum or a nonpublic forum, as Defendants argue, and thus subject to something less than strict scrutiny review, the Defendants could not deny access in a manner that discriminated against the speaker based on the individual's viewpoint. As the Court's analysis will indicate, the Defendants violated the principle of viewpoint neutrality in denying access to the Plaintiffs, which is impermissible discrimination regardless of forum status. *See, e.g., Rosenberger*, 515 U.S. at 829–30, 115 S.Ct. 2510; *Lamb's Chapel*, 508 U.S. at 394, 113 S.Ct. at 2141.

By Policy and practice, the Defendants have opened the Center as a forum for various events conducted by community groups and individuals. *See* Pls.' Ex. A, B, I, & J. Nevertheless, Defendants have denied Plaintiffs the right to conduct an event geared toward community residents because it contains religious speech. *See* Pls.' Ex. D ("religious service meetings"). Plaintiffs' proposed activities included discussions about improving local schools, ensuring safety of students, helping local businesses, engaging in community service, and becoming better role models for local residents and their children, all from a Biblical perspective, in addition to sing-

ing religious songs, and praying about issues the residents faced. *See* Mr. Moore Decl. ¶¶ 6–7, 14.

With respect to viewpoint neutrality, "the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." *Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439 (internal citations omitted); *see also Rosenberger,* 515 U.S. at 829–30, 115 S.Ct. 2510. The City construed the Policy to exclude categorically any event that involves a religious purpose or religious service. *See* Pls.' Exs. D, K, & L. In light of this standard, the Court finds that the City's denial of the Plaintiffs' application to use the Center constitutes viewpoint discrimination. The Supreme Court's decision in *Good News Club* strongly supports this holding. In *Good News Club,* a community-based Christian club for children ages 6–12 requested to use public school facilities during after-school hours for singing songs, Bible lessons, and praying. 533 U.S. at 103, 121 S.Ct. 2093. The Court held that Milford Central School ("Milford") could not prohibit activities such as prayer and religious instruction—activities characterized by the Court has "quintessentially religious"—that were not inconsistent with Milford's policy of permitting "teaching of morals and character development from a particular viewpoint." *Id.* at 111, 121 S.Ct. 2093. The Court declined to label the activities that were at issue, but noted that they were not "mere religious worship, divorced from any teaching of moral values." *Id.* at 112 n. 4, 121 S.Ct. 2093.

The Supreme Court's opinion in *Lamb's Chapel* is instructive. In *Lamb's Chapel,* a community group desired to use public school facilities to present a film series addressing family issues from a religious perspective. 508 U.S. at 387–89, 113 S.Ct.

2141. The purpose of showing the films was to instruct that "the undermining influences of the media . . . could only be counterbalanced by returning to traditional, Christian family values instilled at an early age." *Id.* at 388; 113 S.Ct. 2141. The Court held that excluding the group's event from the school facilities because of the film's religious message constituted unlawful viewpoint discrimination. *Id.* at 394, 113 S.Ct. at 2141.

The Supreme Court's opinion in *Rosenberger* is also instructive. In *Rosenberger,* the Court held that excluding a student evangelistic newspaper called "Wide Awake" from student publications eligible for university funding because of the newspaper's religious overtures amounted to forbidden viewpoint discrimination. 515 U.S. at 831, 115 S.Ct. at 2510. The university had established a student activity fund available to student groups for activities "related to the educational purpose of the university." *Id.* at 824, 115 S.Ct. at 2510. The student newspaper that was denied funding "challenged Christians to live, in word and deed, according to the faith they proclaim and . . . encouraged students to consider what a personal relationship with Jesus Christ means." *Id.* at 826, 115 S.Ct. at 2510. The Court held that by establishing the student activity fund to encourage student activities including the publication of newspapers, the university has created a forum for student speech, and the university's denial of funding to print Wide Awake because of its Christian perspective was viewpoint discrimination. *Id.* at 831; 115 S.Ct. at 2510.

Applying the Court's holding in *Good News Club, Lamb's Chapel,* and *Rosenberger* to the facts at issue, Plaintiffs have demonstrated that the City's rejection of Plaintiffs' proposed event violates their First Amendment free speech rights. This case is indistinguishable from *Good*

*News Club, Lamb's Chapel,* and *Rosenberger.* Here, like in *Good News Club,* the Plaintiffs' proposed activities included meeting to discuss community needs based on the Bible's teachings, singing religious songs, and praying about the needs of the community. Plaintiffs' proposed event cannot be categorized as "mere religious worship, divorced from any teaching of moral values" or other activities permitted in the forum. Certain activities Plaintiffs seek to engage in are "quintessentially religious", *e.g.,* prayer, and if conducted in isolation, may arguably fall within the category of mere religious worship. However, the other proposed activities are clearly consistent with activities permitted by the City.[20] An event addressing local community issues is within the parameters of the forum in light of the City's broad Policy to open the Center "for use of residents" and its past permitted uses, such as club meetings, social gatherings, and family events. Thus, the facts presented here fall squarely within the Supreme Court's precise holding in *Good News Club*—the activities are not limited to "mere religious worship" but include activities benefitting the welfare of the community and other activities consistent with the purposes of the limited public forum.

The City's exclusion based on religion is contrary to the Court's holdings in *Good News Club, Lamb's Chapel,* and *Rosenberger* that the government may not treat activities that are similar to those previously permitted as different in kind just because the subject activities are conducted from a religious perspective. Consequently, Defendants' denial of use by the Plaintiffs constitutes viewpoint discrimination and, thus, is unconstitutional regardless of the characterization of the forum.

Defendants argue that *Good News Club, Lamb's Chapel,* and *Rosenberger* are inapplicable because the present case involves "religious services," and is different in kind from other activities allowed in the forum. Defendants cite *Campbell v. St. Tammany's Sch. Bd.,* 206 F.3d 482 (5th Cir.2000), *reh'g en banc denied,* 231 F.3d 937 (2000), in support of their contention that religious worship services differ from religious discussions in *Good News Club, Rosenberger,* and *Lamb's Chapel.* In *Campbell,* the Court first found that the school district had created a limited public forum. 206 F.3d at 486–87. Next, the Court held that the school district did not engage in viewpoint discrimination by excluding religious services and religious instruction. *Id.* at 487. The Court distinguished between excluding substantive religious services, which is permissible content based discrimination, and speaking on topics with a religious perspective, which is unconstitutional viewpoint discrimination. *Id.* The Supreme Court, however, vacated and remanded *Campbell* to the Fifth Circuit in light of *Good News Club. Campbell v. St. Tammany's Sch. Bd.,* 533 U.S. 913, 121 S.Ct. 2518, 150 L.Ed.2d 691 (2001). Subsequently, the Fifth Circuit remanded the case to the district court in light of *Good News Club. Campbell v. St. Tammany's Sch. Bd.,* 300 F.3d 526 (5th Cir.2002). No decision has been reached by the district court.

Accordingly, *Campbell* is of no precedential value, but even if it was, it is distinguishable from the instant case. The plaintiffs in *Campbell* requested to use the school facilities for "religious worship and instruction." *Id.* at 485. Here, the proposed event involved discussions about im-

---

**20.** The City has permitted similar events addressing the same issues from a secular perspective. *See* Pls.' Ex. B.

proving local schools, ensuring safety of students, helping local businesses, engaging in community service, and becoming better role models for local residents and their children, all from a Biblical perspective, in addition to singing religious songs, and praying about issues the residents faced. *See* Mr. Moore Decl. ¶¶ 6–7, 14. Further, the exclusion at issue in this case—exclusion for religious purposes and religious services—is broader than the exclusion in *Campbell.*

Moreover, the Supreme Court has continually discussed the danger of distinguishing between religious worship services and speaking on topics from a religious perspective:

> [T]he dissent fails to establish that the distinction [between "religious" speech and speech "about" religion] has intelligible content. There is no indication when "singing hymns, reading scripture, and teaching biblical principles" cease to be "singing, teaching, and reading"—all apparently forms of "speech," despite their religious subject matter—and become unprotected "worship." . . . [E]ven if the distinction drew an arguably principled line, it is highly doubtful it would lie within the judicial competence to administer. Merely to draw the distinction would require the university—and ultimately the courts—to inquire into the significance of words and practices to different religious faiths, and in varying circumstances by the same faith. Such inquiries would tend inevitably to entangle the State with religion in a manner forbidden by our cases.

*Rosenberger,* 515 U.S. at 845, 115 S.Ct. 2510 (citing *Widmar,* 454 U.S. at 269–70 n. 6, 102 S.Ct. 269) (citations omitted). To allow the City to draw the distinctions it has attempted to make in this case, would inevitably entangle it with religion in a manner forbidden by the Constitution.

In addition to being viewpoint neutral, restriction on expression in a limited public forum must also be "reasonable in light of the purpose served by the forum." *Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439. Reasonableness in this context is addressed "in light of the purpose of the forum and all the surrounding circumstances." *Id.* at 809, 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567; *see also Heffron v. Int'l Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 650–51, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) ("[C]onsideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in the light of the characteristic nature and function of the particular forum involved.").

The purpose of the Center is to provide a facility for community events "for the use of residents." Pl.'s Ex. A. The policy, on its face, contains no subject matter limitations on use and this is supported by the broad variety of past uses of the Center. *See* Pl.'s Ex. B. Defendants have failed to specify how permitting the Plaintiffs to conduct their event at the Center would interfere in any way with that purpose other than their sole argument that by opening up the Center to the Plaintiffs, they would have to open the Center up to all other religious activities. This justification is not reasonable in light of the purpose of the Center. The Defendants' resistance to allowing religious groups to use the Center carries an implication of hostility toward religion and is inherently discriminatory. In light of the Supreme Court's consistent approval of the use of government property by religious groups any such hostility is unjustified.

Defendants' denied Plaintiffs' request because Plaintiffs' event, addressing the

issues currently faced by local residents, was to contain a religious message, religious songs, and prayer. *See* Pl.'s Ex. D; Def.s' Answer ¶¶ 35, 44. At the same time, Defendants allow various comparable events in the Center. *See* Pl.'s Ex. B. This distinction is not reasonable in light of the purpose served by the forum. *Cf. Daily v. New York Housing Auth.*, 221 F.Supp.2d 390, 398–99 (E.D.N.Y.2002). It is unreasonable for Defendants to decide on an *ad hoc* and discriminatory basis that an event containing religious speech is not permitted in the Center. This discrimination does not serve the purpose of the forum. Accordingly, Defendants' exclusion of Plaintiffs is unreasonable in light of the Center's purpose and, therefore, unconstitutional.

## THE ESTABLISHMENT CLAUSE DEFENSE

■ The Defendants contend that they have a compelling interest in not violating the Establishment Clause of the Constitution of the United States and Art. I, § 7 of the Texas Constitution.[21] The City argues that, even if the Plaintiffs exclusion from the Center was the result of viewpoint discrimination, its interest in not violating the Establishment Clause outweighs Plaintiffs' interest in gaining equal access to the Center. In other words, according to the City, its restriction was required to avoid violating the Establishment Clause. The Court notes that the interest of the Defendants in complying with its constitutional obligations may be characterized as compelling. Nevertheless, it does not follow that an "equal access" policy would be incompatible with the Supreme Court's Establishment Clause cases.

In *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971),[22] the Supreme Court held that government action is consistent with the Establishment Clause if it (1) "has a secular purpose"; (2) "does not have the principal or primary effect of advancing or inhibiting religion"; and (3) "does not foster an excessive entanglement with religion." *Id.* at 612–13; 91 S.Ct. 2105; *see also Lamb's Chapel*, 508 U.S. at 395, 113 S.Ct. 2141; *Widmar*, 454 U.S. at 271–75, 102 S.Ct. 269 (applying *Lemon* test to hold that the Establishment Clause does not bar state university from allowing religious groups to use generally

21. The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." U.S. CONST amend I. Art. I, § 7 of the Texas Constitution provides: "No money shall be appropriated, or drawn from the Treasury for the benefit of any sect, or religious society, theological or religious seminary; nor shall property belonging to the State be appropriated for any such purposes." Defendants have failed to cite any case law nor could the Court find any that supports their argument that the Art. I, § 7 of the Texas Constitution is applicable in this case.

22. The Court notes that, recently, the Supreme Court has not applied the *Lemon* test. Rather, in cases involving Establishment Clause challenges to private individuals' use of government resources, the Court has applied an "endorsement test" developed by Justice O'Connor, which removes the "entanglement" prong of the *Lemon* test and collapses its "purpose" and "effect" prongs into a single inquiry: "would a reasonable, informed observer, i.e., one familiar with the history and context of private individuals' access to the public money or property at issue, perceive the challenged government action as endorsing religion?" *Tenafly Eruv Ass'n, Inc. v. Bor. of Tenafly*, 309 F.3d 144, 174 (3d Cir.2002). Nevertheless, *Lemon* "has not been overruled" and thus remains the starting point for the Court's Establishment Clause analysis. *Lamb's Chapel*, 508 U.S. at 395 n. 7, 113 S.Ct. 2141. The Court will apply the *Lemon* test. In the instant case, the outcome under Justice O'Connor's "endorsement test" is the same as the outcome under the *Lemon* test.

available facilities). In this case all three prongs are clearly met.

First, a neutral City Policy that permitted any group to meet at the Center for any purpose would aid all community residents, regardless of religious affiliation and would, therefore, reflect a secular purpose. Second, since such a policy would make no distinction between groups or their purposes, entanglement with religion would be avoided. Finally, the Court is not persuaded that the "primary effect of the public forum, open to all forms of discourse, would be to advance religion." *Widmar*, 454 U.S. at 273, 102 S.Ct. 269. As the Court noted in *Widmar*, "[i]t is possible—perhaps even foreseeable—that religious groups will benefit from access to [the] facilities. But ... a religious organization's enjoyment of merely 'incidental' benefits does not violate the prohibition against the 'primary advancement' of religion." *Id.;* 102 S.Ct. 269. This Court finds that any religious benefits of an open forum at the Center would be "incidental" within the meaning of the Supreme Court's cases. First, an open forum in a community center "does not confer any imprimatur

of state approval on religious sects or practices." *Id.* at 274; 102 S.Ct. 269. Second, in the absence of empirical evidence that a religious group would dominate the Center, the advancement of religion would not be the forum's "primary effect." *Id.* at 275; 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440.[23]

The Supreme Court has held that a policy of equal access in contexts similar to this case does not violate the Establishment Clause. *See, e.g., Lamb's Chapel,* 508 U.S. at 395, 113 S.Ct. 2141; *Good News Club,* 533 U.S. at 112, 121 S.Ct. 2093.[24] In *Widmar*, the Supreme Court explained that allowing religious speech within the forum "does not confer any imprimatur of state approval on religious sects or practices ... [since] the forum is available to a broad class of nonreligious as well as religious speakers." 454 U.S. at 274, 102 S.Ct. 269. In *Pinette*, the Supreme Court stated:

> We have twice previously addressed the combination of private religious expression, a forum available for public use, content-based regulation, and a State's interest in complying with the Establish-

**23.** The Court notes that in *Good News Club,* the Supreme Court stated:
> When a limited public forum is available for use by groups presenting any viewpoint, however, we would not find an Establishment Clause violation simply because only groups presenting a religious viewpoint have opted to take advantage of the forum at a particular time.

*Good News Club,* 533 U.S. at 119 n. 9, 121 S.Ct. 2093. Thus, it seems that the number of religious groups using Defendants' forum would not alter the analysis.

**24.** In *Good News Club,* the Supreme Court rejected a public school's contention that even if it engaged in impermissible viewpoint discrimination, that discrimination was necessary to avoid violation of the Establishment Clause. 533 U.S. at 113–14, 121 S.Ct. 2093. The Court pointed to *Lamb's Chapel* and *Widmar* for support:

> [I]n *Lamb's Chapel,* we explained that "[t]he showing of th[e] film series would not have been during school hours, would not have been sponsored by the school, and would have been open to the public, not just to church members." 508 U.S. at 395, 113 S.Ct. 2141. Accordingly, we found that "there would have been no realistic danger that the community would think that the District was endorsing religion or any particular creed." *Id.* Likewise, in *Widmar,* where the university's forum was already available to other groups, this Court concluded there was no Establishment Clause problem. 454 U.S. at 272–73 n. 13, 102 S.Ct. 269.

*Id.* at 113, 121 S.Ct. 2093. The Court concluded that "[t]he Establishment Clause defense fares no better in this case."

ment Clause. Both times, we have struck down the restriction on religious content.... We find it peculiar to say that government "promotes" or "favors" a religious display by giving it the same access to a public forum that all other displays enjoy. And as a matter of Establishment Clause jurisprudence, we have consistently held that it is no violation for government to enact neutral policies that happen to benefit religion. 515 U.S. at 762–64, 115 S.Ct. 2440. In sum, neutral accommodation of religious activity does not violate the Establishment Clause.

As in *Good News Club*, Defendants do not have a compelling state interest in avoiding an Establishment Clause violation by denying Plaintiffs' application to use the Center. Plaintiffs' proposed events would occur once a month on a Friday evening. The event is obviously not endorsed by the City. The event is open to all members of the public. In sum, permitting Plaintiffs to hold their monthly event "would ensure neutrality, not threaten it," because Plaintiffs are "seek[ing] nothing more than to be treated neutrally and given access to speak about the same topics as are other groups." *Good News Club,* 533 U.S. at 114, 121 S.Ct. 2093; *see also Bd. of Educ. of Westside Cmty. Schs. v. Mergens,* 496 U.S. 226, 248, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) ("[I]f a State refused to let religious groups use facilities open to others, then it would demonstrate not neutrality but hostility toward religion."). Here, the City's Policy is hostile to religion, not neutral. Permitting Plaintiffs to hold their event does not violate the Establishment Clause.

Defendants cite *Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971), in support of its position that allowing religious worship services to take place on government property advances religion.

In *Tilton,* the Court upheld aid in the form of federal grants for the construction of academic facilities at private universities— some of these universities were church-related. The legislation included a restriction that the building not be used for "sectarian instruction or as a place for religious worship." *Id.* at 675, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790. The aid was upheld because its purpose was secular and its primary effect was not the advancement of religion. However, the Court did strike that portion of the legislation that terminated after twenty years the restriction on religious use of the facilities. The Court found that:

> Limiting the prohibition for religious use of the structure for 20 years obviously opens the facility to use for any purpose at the end of that period. It cannot be assumed that a substantial structure has no value after that period and hence the unrestricted use of a valuable property is in effect a contribution of some value to a religious body. Congress did not base the 20–year provision on any contrary conclusion. If, at the end of 20 years, the building is, for example, converted into a chapel or otherwise used to promote religious interests, the original federal grant will in part have the effect of advancing religion.

*Id.* at 683; 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790.

The Court in *Tilton* was concerned with the fact that a sectarian college would be granted exclusive control of a government-funded building on its campus and perhaps, therefore, devote the building to religious purposes. Here, however, there is no question that the City will continue to control its Center. It is not vesting any title in any sectarian group. A neutral accommodation of use by the City of individuals whose activities are religious is far different than the total dedication of gov-

ernment-funded buildings to a sectarian institution for sectarian purposes. Thus, *Tilton* is wholly inapplicable in this case. Moreover, Defendants' specific reliance on *Tilton* has been rejected in *Widmar*:

> In finding that an "equal access" policy would have the primary effect of advancing religion, the District Court in this case relied primarily on *Tilton* .... From [*Tilton*], the District Court derived the proposition that state funds may not be used to provide or maintain buildings used by religious organizations.... We do not believe that *Tilton* can be read so broadly.... [N]othing in *Tilton* suggested a limitation on the State's capacity to maintain forums equally open to religious and other discussions.

454 U.S. at 272 n. 12, 102 S.Ct. 269. Accordingly, the Court rejects Defendants' *Tilton* argument.

### PERMANENT INJUNCTION STANDARD

■ The Fifth Circuit has held that "[i]njunctive relief is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir.1985). The standard for a permanent injunction is "essentially the same" as for a preliminary injunction, in that the plaintiff must establish each of the following four elements: (1) actual success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury outweighs any damage that the injunction may cause the defendants; and (4) that the injunction will not impair the public interest. *Millennium Restaurants Group, Inc. v. City of Dallas*, 191 F.Supp.2d 802, 809 (N.D.Tex.2002). *See also Enrique Bernat F., S.A. v. Guadalajara, Inc.*, 210 F.3d 439, 442 (5th Cir.2000) (citing *Sugar Busters L.L.C. v. Brennan*, 177 F.3d 258, 265 (5th Cir.1999)) (standard for preliminary injunction). The difference between the standard for a permanent injunction and the standard for a preliminary injunction is that in the former the court determines the plaintiff's success on the merits rather than the plaintiff's likelihood of success on the merits. *See Millennium Restaurants*, 191 F.Supp.2d at 809. The Court now determines whether applying the prevailing law to the facts of this case warrants the issuance of a permanent injunction.

As provided in detail above, Plaintiffs have demonstrated actual success on the merits. Thus, the Court will analyze whether Plaintiffs face continuing irreparable injury. It is well established that loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a permanent injunction. *See Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir.1981) (citing *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Defendants argue that Plaintiffs' failure to promptly seek an injunction calls into question their claim of irreparable injury. Specifically, Defendants allege that Plaintiffs waited for more than eight months after their request for permission to use the Center was denied before seeking an injunction. Rather than the eight month delay alleged by Defendants, Plaintiffs claim that they attempted to resolve this issue short of litigation. In particular, Plaintiffs attempted on a number of occasions to obtain information regarding the relevant policies and uses of the center pursuant to public records laws. This information was finally provided on August 13, 2002 and the Plaintiffs subse-

quently filed suit on August 19, 2002. Thus, Plaintiffs were sufficiently diligent to support a claim of irreparable injury. Moreover, any delay by Plaintiffs does not undermine the fact that they still cannot use the Center for their proposed event. Accordingly, Plaintiffs suffered irreparable harm when Defendants denied their application to use the Center.

In balancing the potential harms to the parties resulting from issuance of the injunction, the Court concludes that the weight of the equities is strongly in Plaintiffs' favor. Plaintiffs have shown actual success on the merits. Any threatened harm to Defendants arising from being enjoined is slight, while the harm faced by the Plaintiffs is irreparable. Accordingly, the Court concludes that a balance of the respective hardships mandates the issuance of a permanent injunction.

Finally, a permanent injunction will not disserve the public interest. It is in the public's interest to protect rights guaranteed under the Constitution. The public interest will be served by the issuance of a permanent injunction.

In sum, the Court finds that a permanent injunction would prevent irreparable injury to the Plaintiffs, not unduly damage the Defendants, and be in the best interest of the public.

## CONCLUSION

For the reasons discussed above, Plaintiffs' request for declaratory judgment and permanent injunction is **GRANTED.** Within ten (10) days of this date, counsel for the plaintiff shall submit a proposed form of judgment in conformity with this memorandum order. Defendants shall have ten (10) days to file an objection to Plaintiffs' proposed judgment. Furthermore, Plaintiffs shall file a brief in support of their request for attorney's fees together with supporting time and expense rec-

ords to support the amount requested within ten (10) days from the date hereof. Defendants shall then have ten (10) days from the date of the Plaintiffs' brief to file a responsive brief.

**IT IS SO ORDERED.**